# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Apple iPhone<br>Seized in Evidence Bag SSEE EM000465586 | )<br>)<br>) Case No. **23mj1427**<br>)<br>)<br>) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the ___Southern___ District of ___California___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC sec. 841, 846 | Distribution of Controlled Substances, Possession with Intent to Distribute, |
| 21 USC sec. 843(b) | Conspiracy, Use of Communications Facility |

The application is based on these facts:
See Attached Affidavit of DEA Special Agent Roberto Chavez, incorporated herein by reference.

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Roberto Chavez*
Applicant's signature

Special Agent Roberto Chavez, DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephone___ *(specify reliable electronic means)*.

Date: 04/20/2023

Judge's signature

City and state: San Diego, California

Hon. Karen S. Crawford, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT

I, Roberto Chavez, being duly sworn, hereby state as follows:

## I.

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic device:

>Black Samsung Cellular Phone
>Held in Evidence Bag SSEE EM000465601
>("**Target Device 1**")

>Black Apple iPhone
>Seized in Evidence Bag SSEE EM000465586
>("**Target Device 2**")

as further described in Attachments A-1 and A-2, and to seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 841, 843(b), 846, as further described in Attachment B. The requested warrant relates to an investigation of Angel GUTIERREZ, and others known and unknown, for criminal violations of the offenses identified above. The **Target Devices** are currently in the custody of the Drug Enforcement Administration and located at 2055 Sanyo Avenue, Suite 220, San Diego, CA 92154.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## II.

## EXPERIENCE AND TRAINING

3. I am a United States Drug Enforcement Administration (DEA) Special Agent

(SA) charged with enforcing United States Code (U.S.C) Title 21, of the Controlled Substance Act. I am empowered and required by law to conduct investigations and make arrests under 21 U.S.C. § 878.

4. I am currently assigned to DEA Group 71 at the San Ysidro District Office (SYDO). I have been employed with the DEA since September 2018. My duties include the investigation and apprehension of individuals involved in narcotics-related activities. I have received formal training at the DEA Training Academy located in Quantico, Virginia. My training included the identification of many types of controlled substances by sight and odor.

5. During my tenure with DEA, I have participated in investigations into the unlawful importation, possession with intent to distribute, and distribution of controlled substances, including fentanyl, cocaine, methamphetamine, and heroin. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder narcotics-related monetary proceeds into and through the Southern District of California. I am familiar with the methods employed by Mexican drug cartels and the sophisticated tactics that they routinely use to attempt to thwart investigation of their unlawful activities. These tactics include cellular telephone technology, counter surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have become familiar with the manner in which controlled substances are packaged, marketed, sold, and consumed.

6. Prior to working for DEA, I served as a United States Border Patrol Agent for approximately eight years. As a Border Patrol Agent, I was responsible for investigating

2

illegal immigration and narcotics trafficking into the United States. During my time in the Border Patrol, I received formal training in the identification of trafficking techniques used by traffickers of humans and narcotics. Prior to working for the Border Patrol, I served in the United States Marine Corps with Marine Corps Security Forces Battalion (MCSF BN) in Norfolk, Virginia and 2nd Battalion 1st Marine Regiment in Camp Pendleton, California. I hold a bachelor's degree in Business Management and a master's degree in Business from the University of Southern California (USC).

7. Based upon my training and experience as a DEA Special Agent, consultations with other law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug traffickers often work in concert utilizing cellular/mobile telephones because they are mobile and provide instant access to calls, text messaging capabilities, web, and voice messages.

   b. Drug traffickers often use cellular/mobile telephones to arrange the importation and/or transportation of their illegal cargo.

   c. Drug traffickers often use cellular/mobile telephones to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   d. Drug traffickers often use cellular/mobile telephones to provide instructions and synchronize an exact drop off and/or pick up time between load drivers and stash house operators (or others) of their illegal cargo.

   e. Drug traffickers often use cellular/mobile telephones to notify or warn accomplices of law enforcement activity, including the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

8. Based upon my training, experience, consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation and/or transportation of narcotics may yield evidence:

    a. tending to indicate efforts to distribute federally controlled substances, launder and/or smuggle the proceeds of drug trafficking out of the United States, and conspire to do the foregoing;

    b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the importation and/or distribution of federally controlled substances, launder and/or smuggle the proceeds of drug trafficking out of the United States, and conspire to do the foregoing;

    c. tending to identify co-conspirators, criminal associates, or others involved in the importation and/or distribution of federally controlled substances, launder and/or smuggle the proceeds of drug trafficking out of the United States, and conspire to do the foregoing;

    d. tending to identify travel to or presence at locations involved in the importation and/or distribution of federally controlled substances and movement of cash proceeds, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or person(s) with control over or access to, the **Target Devices**; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III.

## FACTS SUPPORTING PROBABLE CAUSE

9. This application arises in the course of a long-running investigation into a cross-border drug-smuggling ring. In summary, on May 20, 2021, investigators conducted surveillance of Jose Refugio VASQUEZ, in conjunction with wiretap interceptions of his phone, as he drove from San Diego to Los Angeles to deliver distribution quantities of fentanyl and heroin to two recipients. The interceptions occurred over a facility (*i.e.*, VASQUEZ's phone) identified in this affidavit as **Target Telephone 1**. (To differentiate from this facility, I refer to GUTIERREZ's phones as "**Target Devices**.") One of these recipients was Angel GUTIERREZ, who was stopped by law enforcement shortly after receiving the drugs from VASQUEZ. In the course of that stop, law enforcement seized the **Target Devices** from GUTIERREZ.

10. At about 8:00 a.m. on May 20, 2021, investigators established surveillance around 1832 Isla Del Campanero, San Ysidro, where they knew from prior surveillance that VASQUEZ lived. Upon arriving, an investigator saw an orange Mini Cooper bearing California license plates parked in the driveway. Investigators knew from surveillance that VASQUEZ drove this car.

11. At about 10:22 a.m., an investigator saw the same orange Mini Cooper in the north parking lot area at the Villa Serena Apartments on the southeast corner of Dairy Mart Road and San Ysidro Boulevard, in San Ysidro. One minute later, VASQUEZ approached a parked black Jeep Cherokee bearing California license plates, and then walked away from the Jeep with a white grocery-store white plastic bag, back to the Mini Cooper.

12. At about 11:58 a.m., investigators saw the Mini Cooper exit I-5 at El Camino Real, in San Clemente. The Mini Cooper parked at a Jack-in-the-Box on South El Camino

5

Real; VASQUEZ stayed in the car. He then drove the Mini Cooper back to I-5 and went north.

13. At about 12:23 p.m., **Target Telephone 1** received a text message from a Mexico-based phone number that, per analysis of toll records and related information, investigators attributed to a Mexico-based source of drugs.[1] I refer to this number as the "9266 Number" because those are the last four digits of the phone number. At 12:26 p.m., the 9266 Number called **Target Telephone 1**. The following is a transcription of the pertinent portion of that call, along with investigators' interpretation of it:

| | |
|---|---|
| VASQUEZ | Hey! |
| QUEVEDO | That's the information for the Jordans. |
| VASQUEZ | Okay. I think yeah, I just received it. Okay. |
| QUEVEDO | [U/I]. I will send you the one for the vitamins right now. |
| VASQUEZ | Oh okay. This is, what you sent me is for the brown one, right? |
| QUEVEDO | Yes dude. The black tennis shoes. |
| VASQUEZ | Okay, all set. |
| QUEVEDO | Alright. I'll send you the other one right now. |

Following this exchange, at 12:42 p.m., the 9266 Number sent another text message to **Target Telephone 1**. From the context here, I believe this text was the location information for VASQUEZ to deliver the M30 pills to Raul ELENES-Bojorquez, one of the two people whom VASQUEZ met with in Los Angeles later that day.

14. At about 12:53 p.m., investigators saw the Mini Cooper exit Firestone Boulevard near La Mirada, California. A minute later, it drove into the parking lot of an In-N-Out Burger and parked behind it. Investigators then observed VASQUEZ exit the Mini Cooper, while on his cellular telephone. At about 12:56 p.m., **Target Telephone 1** placed an outgoing call to Mexico-based telephone number 52-669-198-0313

---

[1] Investigators were not intercepting electronic communications over **Target Telephone 1** and so do not have the content of this message. They identified it from pen-register data.

6

("UM0313"). The following is a transcription of the pertinent portion of that call, along with investigators' interpretation of it:

| | | |
|---|---|---|
| UM0313 | | Hello. |
| VASQUEZ | | Hello, I'm calling on behalf of Raul. |
| UM0313 | | Raul, on behalf of who sir? |
| VASQUEZ | | On behalf of Raul, with, with Ramon. |
| UM0313 | | Let me ask for him [U/I] and, I'll let you know. |
| VASQUEZ | | Oh OK. |

15. Based on the context of the call, debriefs with arrestees, and CS debriefs, investigators believe VASQUEZ was calling UM0313 to get in contact with ELENES, whom VASQUEZ later delivered drugs to. At about 12:59 p.m., investigators saw the Mini Cooper depart the In-N-Out Burger parking lot and take a right-turn on Firestone Blvd, driving northbound on I-5 and exiting near Downey. The Mini Cooper then took a left turn on Paramount Boulevard and drove to a KFC, parking in the parking lot.

16. At about 1:26 p.m., **Target Telephone 1** placed an outgoing call to telephone number 323-849-5204, which was later found to be in the possession of ELENES. The following is a transcription of the pertinent portion of that call:

| | | |
|---|---|---|
| ELENES | | Hello. |
| VASQUEZ | | Hey buddy. |
| ELENES | | Go ahead. |
| VASQUEZ | | I'm 15 minutes away. |
| ELENES | | Oh, okay. Look for a little Caesar and stop there. I will come there. |
| VASQUEZ | | Alright. |
| ELENES | | Alright partner. |

17. At approximately 1:34 p.m., investigators saw the Mini Cooper depart the KFC parking lot and travel northbound on Florence Avenue; it drove to a Little Caesars Pizza on Atlantic Avenue in Cudahy. At about 1:46 p.m., **Target Telephone 1** placed an

7

outgoing call to telephone number 323-849-5204 believed to be used by ELENES. The following is a transcription of the pertinent portion of that call:

| | | |
|---|---|---|
| ELENES | | What's up man? |
| VASQUEZ | | How's it going? Where are you? |
| ELENES | | I'll be there right now. Are you there? |
| VASQUEZ | | Yeah. |
| ELENES | | Alright. I'm coming. |
| VASQUEZ | | Alright. |

18. At about 1:52 p.m., **Target Telephone 1** placed an outgoing call to telephone number 562-503-3885 ("UM3885"). The following is a transcription of the pertinent portion of that call:

| | | |
|---|---|---|
| UM3885 | | Yes, hello. |
| VASQUEZ | | How's it going? |
| UM3885 | | What's up sir? |
| VASQUEZ | | [U/I]. |
| UM3885 | | I already got…I already, already got your information. I will send you the address right now so that you can come nearby. |
| VASQUEZ | | Oh okay, send it to me. And, and, we are set. Thank you. |
| UM3885 | | Alright. |

19. At approximately 1:55 PM, **Target Telephone 1** received an incoming call from telephone number 323-849-5204 believed to be used by ELENES. The following is a transcription of the pertinent portion of that call:

| | | |
|---|---|---|
| ELENES | | What's up dude? |
| VASQUEZ | | How's it going? |
| ELENES | | Listen, what are you in buddy? I'm on my way to…I will stop here by, by, here by the pizzas. |
| VASQUEZ | | I'm right in front of the pizzas, I'm right in front of, of Samery Insurance in a car, in a bright car. |

8

| | | |
|---|---|---|
| ELENES | | Bright car, bright car…Son of a bitch. Which one is it? A Mini Cooper or what? No. an orange Mini Copper… |
| VASQUEZ | | [U/I] |
| ELENES | | Is the one that is there. |
| VASQUEZ | | Yeah. |
| ELENES | | Oh yea? That one? |
| VASQUEZ | | Yeah. |
| ELENES | | Okay. |

20. Just after this call, investigators saw VASQUEZ provide a white plastic to a then-unidentified male, later identified as ELENES, who was driving a gray Nissan Altima bearing California license plates. Investigators coordinated with Bell Gardens Police Department to conduct a vehicle stop; at about 2:01 p.m., Bell Gardens Police Department conducted a traffic stop of ELENES, who gave consent to the officer to search his car. Contemporaneously, the officer had a K-9 Unit review the car, and the K-9 alerted. This led to a search of the car, in which officers found two vacuum-sealed packages that contained blue "M30" tablets. Subsequent testing confirmed that the seizure comprised 18,010 fentanyl-laced tablets.

21. At this same time **Target Telephone 1** placed an outgoing call to telephone number 562-503-3885 ("UM3885"). The following is a transcription of the pertinent portion of that call:

| | | |
|---|---|---|
| UM3885 | | What's going on sir? |
| VASQUEZ | | I'll be there in about five minutes. |
| UM3885 | | Oh, alright. Then let me call [U/I]. |
| VASQUEZ | | How long before you get there? |
| UM3885 | | Uh, more or less the same time sir. |
| VASQUEZ | | Oh, okay. That's fine. Then I'll see you there. Um… |
| UM3885 | | Alright. |
| VASQUEZ | | What, what's there? |

9

| | | |
|---|---|---|
| UM3885 | [U/I] | |
| VASQUEZ | What was that? | |
| UM3885 | What car are you in? | |
| VASQUEZ | I'm in a car, um, bright, small, orange color. | |
| UM3885 | In an orange car? | |
| VASQUEZ | Yea. You will [U/I]… | |
| UM3885 | Is it a two or four door sir? | |
| VASQUEZ | Two door. | |
| UM3885 | Okay, let me tell the guy so he can start heading over there. | |
| VASQUEZ | Okay. Then I'll be there in about five, six minutes. But what is it there? Is it stores or what is it? Do you know? | |
| UM3885 | I think it's a shopping center sir. | |
| VASQUEZ | Okay. That's fine. | |
| UM3885 | Alright. | |
| VASQUEZ | All set. | |

22. At about 2:00 p.m., investigators saw the Mini Cooper drive to a Pollo Loco restaurant in Cudahy, California, and then drive to Lynwood. In Lynwood, investigators saw the Mini Cooper park in front of a business. They also saw a black Nissan Sentra bearing California license plates park near the Mini Cooper and a then-unidentified man, later identified as GUTIERREZ, get out and walk to the Mini Cooper. As investigators watched, GUTIERREZ walked up to the passenger side of the Mini Cooper and then walked away, carrying a white plastic bag.

23. After this meeting, GUTIERREZ drove away and was stopped by Los Angeles Sheriff's Department Deputies for veering between lanes. GUTIERREZ was the driver and sole occupant of the car, and he did not have a driver's license at the time. During the stop, the Deputies saw loose marijuana scattered in the car and smelled the odor of marijuana. This led to a search of the car, in which they found the plastic bag, which contained a brown substance resembling heroin, on the passenger-side floorboard. At that

point, GUTIERREZ was placed under arrest. Subsequent testing confirmed that the substance comprised 994 grams of heroin.

24. I cannot say precisely where the **Target Devices** were located at the time of GUTIERREZ's arrest, but am confident from these circumstances that they were either on his person or in the Nissan Altima. GUTIERREZ was the sole occupant of the Nissan Altima at the time of the arrest. In light of these circumstances, I submit there is probable cause to believe GUTIERREZ had control over both **Target Devices**.

25. After the **Target Devices** were seized, they were transported to a Los Angeles Sheriff's Department location, and stored in a secure location pursuant to that agency's procedures. On September 14, 2021, DEA investigators took custody of the **Target Devices** and transported them to their current location, where they have been processed and retained for safekeeping.

## IV.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

26. Based upon my experience and training, consultation with other law enforcement officers experienced in drug investigations, and all facts and opinions set forth in this affidavit, I know that:

   a. Individuals involved in drug distribution activity use cellular telephones and electronic communication devices to conduct their criminal activities. An examination of the **Target Devices** will enable investigators to establish further evidence of drug distribution and importation, and co-conspirators. That evidence is, I believe, likely to include information pertinent to distribution of controlled substances.

   b. Cellular telephones and electronic communication devices (Tablets, I-Pads, etc.) are capable of storing many different types of data that are invaluable to investigators and could be evidence of criminal conduct. This data, sought pursuant to the requested search warrants, consists of the contents of the cell phones' or electronic communication devices' memory, including: stored

      names and telephone numbers in the memory, "phonebook" or list of contacts, and/or speed dial functions of the phones; phone numbers dialed for the most recent outgoing or "sent" calls of the telephones, along with date and time of call data; phone numbers dialing the telephones for the most recent incoming "received" calls, along with date and time of the call data; phone numbers dialing the telephone for the most recent "missed" calls, along with the date and time of call data; GPS navigation information; internet searches and websites viewed; and deleted data.

    c. Drug traffickers commonly use cellular telephones, blackberries, PDAs, electronic communication devices, other personal handheld electronic devices, and laptop and desktop computers to communicate with, among others, their customers, their suppliers, and other criminal associates, and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities. Drug traffickers also commonly store records of the business of distributing and selling drugs on telephones, computers, and other forms of digital media.

    d. In addition to their use of computers and digital media, persons involved in drug trafficking activity often use mobile phones in furtherance of these activities. When used in this manner, the mobile phones typically contain data constituting evidence of these activities. Many current mobile phones are sophisticated computing devices and are capable of performing many of the same functions as computers. They are commonly used in furtherance of illicit activity in the same manner as computers.

27. In this case, I am aware that GUTIERREZ participated in a single hand-off of drugs on May 20, 2021. Given these events, I seek permission to search the **Target Devices** for the period of February 21, 2021, through May 21, 2021. I seek to search through the day following GUTIERREZ's arrest because in my experience, people do not always know

right away when a co-conspirator has been arrested, such that co-conspirators of GUTIERREZ's may have tried to reach out to him without realizing he had been arrested.

## V.
## PROCEDURE FOR ELECTRONICALLY STORED INFORMATION AS TO ANY CELLULAR TELEPHONES

28.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29.     Following the issuance of this warrant, agents will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target**

**Devices** and the memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30.   Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## VII.
## CONCLUSION

31.   Based upon my experience and training, consultation with other law enforcement officers experienced in drug investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists to conclude that **Target Telephone**, as further described in Attachments A-1 and A-2, incorporated herein, was utilized to facilitate violations of Title 21, United States Code, Sections 841, 843(b), and 846 (distribution of controlled substances, possession with intent to distribute, conspiracy to commit the foregoing, and use of communications facilities in furtherance of the foregoing). Furthermore, I believe there is probable cause to conclude that **Target Devices** contains stored data that constitutes evidence, fruits, and instrumentalities of such violations, and I respectfully request warrants be issued authorizing a search for and seizure of that data, as further described in Attachment B, incorporated herein. For the reasons provided, I seek authority to search **Target Devices 1** and **2** from February 21, 2021, up to

//
//
//
//
//
//
//

14

and including May 21, 2021.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Roberto Chavez*
Special Agent Roberto Chavez
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 5.1 this 20th day of April, 2023.

The Honorable Karen S. Crawford
United States Magistrate Judge

**Attachment A-2**

*Item to be Searched*

The item to be searched is as follows:

    Black Apple iPhone

    Seized in Evidence Bag SSEE EM000465586

    ("**Target Device 2**")

**Target Device 2** is currently in the custody of the Drug Enforcement Administration and located at 2055 Sanyo Avenue, Suite 220, San Diego, CA 92154.

## Attachment B

### *Items to be Seized*

Authorization to search the **Target Devices** described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Devices** for evidence described below. The seizure and search of the **Target Devices** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, between the dates of February 21, 2021, up to and including May 21, 2021:

   a. tending to indicate efforts to distribute federally controlled substances, and conspire to do the same;

   b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the distribution of federally controlled substances, and conspire to do the same;

   c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of federally controlled substances, and conspiracy to do the same;

   d. tending to identify travel to or presence at locations involved in the distribution of federally controlled substances, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or person(s) with control over or access to, the **Target Devices**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, U.S.C., Sections 841, 843(b), and 846.